McNUTT CONSTRUCTION/FIRST
GENERAL SERVICES
Appellants

v.

Clifford F. SCOTT;  Irene Steen, Ad-
ministrative Law Judge;  and Work-
ers' Compensation Board Appellees

No. 2000–SC–0294–WC.

Supreme Court of Kentucky.

Jan. 25, 2001.

Rehearing Denied April 26, 2001.

Douglas A. U'Sellis, Boehl, Stopher, & Graves, Louisville, for Appellant.

John W. Bland, Jr., Bland & Birdwhistell, Elizabethtown, for Appellee Scott.

## OPINION OF THE COURT

This workers' compensation appeal concerns whether a finding of permanent, total disability was proper under the December 12, 1996, version of Chapter 342 and whether the evidence required an exclusion for the "natural aging process."

The claimant was born in 1959. He had a high school education and no specialized or vocational training. He worked primarily as a carpenter in the construction industry and had owned his own construction company for about 6 years. In October, 1996, he became employed by the defendant-employer as a craftsman, estimator, and project manager.

On December 17, 1996, the claimant sustained a work-related lower back injury when he fell through the floor of a house that had been damaged by fire. An MRI revealed a ruptured disk, after which surgery was performed by Dr. Cheng. A subsequent attempt to return to light duty was unsuccessful, and the claimant has not worked since February 27, 1997. A second surgery for a recurrent ruptured disk was performed in August, 1997.

The claimant indicated that he was unable to twist his back without experiencing excruciating pain. He could sit for about an hour, walk for about 1½ to 2 hours, and work for about ten minutes at a task such as raking his horse stalls before being required to take a substantial break. He experienced a toothache-like pain in his back at all times, and it became worse with activity. He had trouble bending over, tying his shoes, and putting on his pants. He testified that he had to lie down 2–3 times a day due to the severity of his pain and that he could not perform the type of work he had done in the past. However, he did indicate that he had a computer at home and hoped to be able to find some employment in which he would be able to change positions as needed.

Dr. Lehman saw the claimant once, in April, 1997. He noted the L5–S1 diskectomy and appropriate history of the work injury. He assessed a 10% functional impairment, half of which he attributed to pre-existing conditions as evidenced by the MRI of February, 1997, which showed dehydration at L4–5 and L5–S1 as well as the herniated disc at L5–S1. He restricted the claimant from repetitive lifting and bending and from lifting more than 40 pounds.

Both of the claimant's surgeries were performed by Dr. Cheng, an orthopedic surgeon. In a Form 107 medical report of January 28, 1998, he attributed claimant's problems to the work injury and indicated that it was not due, in part, to the arousal of a pre-existing, dormant, nondisabling condition or to a congenital abnormality. Another Form 107 also reported the absence of abnormalities and indicated that the claimant's injury was not related to the natural aging process. However, when he was deposed in May, 1998, Dr. Cheng testified that a pathology report following the first surgery did indicate that tissue which was removed evidenced degenerative changes. In view of this report, his amended diagnosis was degenerative ar-

thritis of the lower spine subsequent to two laminectomies and a chronic low back strain. Dr. Cheng assigned a 15% impairment under the AMA Guidelines, using the range of motion model, and a 12% impairment using the DRE model.

Dr. Cheng was asked whether the degenerative changes to which the pathology report referred were consistent with the natural aging process, and he replied in the affirmative. He was then asked whether he attributed any part of the impairment rating to the natural aging process to which he replied:

I would, I would say 50 percent due to the arousal of the pre-existing and 17½— I mean 7½ percent due to the arousal of pre-existing condition; 7½ percent due to the injury itself.

When asked to confirm that the pre-existing condition to which he referred was the degenerative condition and that the degenerative condition was due to the natural aging process, he replied, "That is correct."

Dr. Cheng testified that it would be difficult for the claimant to perform heavy manual labor such as carpentry, that he should not lift more than 20 pounds, and that he should not engage in prolonged bending, stooping, or climbing. He testified that the claimant remained on epidural blocks to alleviate pain and had not returned to work on doctor's orders.

Dr. Whobrey, a specialist in physical medicine and rehabilitation, performed an independent medical evaluation. She saw the claimant on two occasions in July and August, 1997, before the second surgery. She diagnosed persistent lumbar radiculopathy which affected the right leg, noted the diskectomy which had been performed at L5–S1, and also noted a limited range of motion of the lumbar spine. She assigned a 10% impairment rating under the AMA Guidelines, using the DRE model, and tes-

tified that the rating would have remained the same after the second surgery. She restricted the claimant from repetitive bending and repetitive lifting of more than 25 pounds, and imposed an occasional lifting limit of 50 pounds. She indicated that claimant should avoid prolonged walking, standing or running; that he should avoid squatting, kneeling, and crawling; and that he should avoid repetitive stooping and twisting. In her opinion, the claimant would not be able to return to his previous work. She testified that although x-rays revealed some degenerative changes, none were at the L5–S1 level; furthermore, the MRI revealed no degeneration.

The Administrative Law Judge (ALJ) determined that the claimant was permanently and totally occupationally disabled and that he could not return to any gainful employment at that time due to his work restrictions, his level of pain, and his need to lie down several times a day. However, noting that the claimant had a high school diploma, she referred him for vocational rehabilitation in the hope that he could be retrained for sedentary employment. With regard to the employer's assertion that there should be an exclusion from the award for the natural aging process, the ALJ determined that no physician had attributed a portion of the claimant's ultimate disability to the natural aging process. The ALJ noted that Dr. Cheng gave a $^{50}\!/\!_{50}$ apportionment which appeared to have been made under "the old dormant nondisabling standards which were in use in Special Fund cases." Noting that Dr. Cheng had specifically stated that the accident, itself, had caused the claimant's back problems, the ALJ concluded that no portion of the claimant's disability should be excluded as being attributable to the natural aging process.

The employer petitioned for reconsideration with regard to the effect of the natu-

ral aging process, reciting portions of Dr. Cheng's testimony. In overruling the petition, the ALJ quoted directly from Dr. Cheng's testimony to the effect that the only sign of pre-existing degenerative changes appeared in a pathology report after the claimant's first surgery. Dr. Cheng explained that all individuals have some degree of degenerative changes as they age, that neither x-ray nor MRI revealed significant degenerative changes in the claimant, and that the claimant had no prior symptoms. For that reason, in his opinion, it was more likely that the claimant's problem was due to the accident than to the effects of aging. He then indicated that he was unaware of the 1996 changes in the law until he was informed of them in the process of giving his deposition. The ALJ concluded that Dr. Cheng's testimony clearly indicated that he attributed no portion of the claimant's disability to the mild degenerative changes to which the pathology report referred. The ALJ also noted that, like Dr. Cheng's testimony, a Form 107 report which he prepared indicated that the claimant's disability was in no part due to the natural aging process.

The Workers' Compensation Board (Board) affirmed the decision of the ALJ, and the Court of Appeals affirmed the decision of the Board. This appeal by the employer followed.

The employer asserts that by finding the claimant to be totally, occupationally disabled, the ALJ misinterpreted the December 12, 1996, amendments to Chapter 342. A second argument is that, based upon Dr. Cheng's testimony, one-half of any benefits must be excluded because that portion of the claimant's disability is attributable to the effects of the natural aging process.

We begin our analysis by reviewing the relevant statutory provisions. Claimant's accident occurred on December 17, 1996. As amended effective December 12, 1996,

KRS 342.0011 provides, in pertinent part, as follows:

(1) "Injury" means any work-related traumatic event or series of traumatic events, including cumulative trauma, arising out of and in the course of employment which is the proximate cause of producing a harmful change in the human organism evidenced by objective medical findings. "Injury" does not include the effects of the natural aging process ....

. . . .

(11) (b) "Permanent partial disability" means the condition of an employee who, due to an injury, has a permanent disability rating but retains the ability to work; and

(c) "Permanent total disability" means the condition of an employee who, due to an injury, has a permanent disability rating and has a complete and permanent inability to perform any type of work as a result of an injury ....

. . . .

(34) "Work" means providing services to another in return for remuneration on a regular and sustained basis in a competitive economy.

Consistent with the 1994 amendment to KRS 342.730(1)(a), which legislatively overruled the decision in *Teledyne–Wirz v. Willhite*, Ky.App., 710 S.W.2d 858 (1986), the 1996 version of KRS 342.730(1)(a) provides that nonwork-related impairment is not to be considered when determining whether a worker is totally disabled. *See, Spurlin v. Adkins*, Ky., 940 S.W.2d 900, 903 (1997). The 1994 version of KRS 342.730(1) contained a similar prohibition with regard to certain permanent, partial disability awards. As amended effective December 12, 1996, KRS 342.730(1)(e) indicates that, for permanent, partial disabil-

ity, impairment due to a nonwork-related disability may not be considered.

■ The employer emphasizes that, as amended effective December 12, 1996, Chapter 342: 1.) provided that a harmful change to a worker's body is not compensable as an "injury" if it is attributable to the natural aging process; 2.) eliminated Special Fund liability for post-December 12, 1996, claims; and 3.) provided that nonwork-related impairment shall not be considered when determining a worker's disability. The employer points to Dr. Cheng's testimony that half of the functional impairment to claimant's spine was due to the arousal of a prior, dormant degenerative condition. The employer argues that disability which results from the arousal of the prior, dormant degenerative condition should not be considered because the condition is due to the natural aging process and, therefore, is not an "injury" for the purposes of Chapter 342. We disagree.

■ As we construe the definition of "injury," the critical question is one of causation. Although KRS 342.0011(1) clearly indicates that the effects of the natural aging process are not considered to be an "injury," it also clearly indicates that work-related trauma "which is the proximate cause producing a harmful change in the human organism" *is* an "injury." When the two provisions are considered in concert, it appears that their purpose is to emphasize that only those harmful changes which are proximately caused by work-related trauma are compensable pursuant to Chapter 342. Where work-related trauma causes a dormant degenerative condition to become disabling and to result in a functional impairment, the trauma is the proximate cause of the

harmful change; hence, the harmful change comes within the definition of an injury.[1] We are not persuaded that the legislature's decision to abolish Special Fund apportionment with regard to traumatic injury claims had any effect on the longstanding principle that a harmful change to a worker's body which is caused by work is an "injury" for the purposes of Chapter 342.

■ Having established that disability which results from the arousal of a prior, dormant condition by a work-related injury remains compensable under the 1996 Act, we turn to the question concerning whether the claimant's occupational disability was partial or total. The employer asserts that the 1996 amendments to KRS 342.0011(11) legislatively overruled the definition of occupational disability which was set forth in *Osborne v. Johnson*, Ky., 432 S.W.2d 800 (1968), and codified in the pre-December 12, 1996, version of KRS 342.0011(1). It argues that the amendments preclude a consideration of anything but the factors which they set forth.

■ Pursuant to the 1996 amendments, awards for permanent, partial disability are a function of the worker's AMA impairment rating, the statutory multiplier for that rating, and whether the worker can return to the pre-injury employment; thus, it is clear that the ALJ has very limited discretion when determining the extent of a worker's permanent, partial disability. *See*, KRS 342.730(1)(b) and (c). However, determining whether a particular worker has sustained a partial or total occupational disability as defined by KRS 342.0011(11) clearly requires a weighing of the evidence concerning whether the worker will be able to earn an income by pro-

1. In a similar vein, to the extent that a dormant degenerative condition, itself, is proximately caused by work, the condition comes within the definition of an injury. *See, Haycraft v. Corhart Refractories Co.*, Ky., 544 S.W.2d 222, 225 (1976).

viding services on a regular and sustained basis in a competitive economy. For that reason, we conclude that some of the principles set forth in *Osborne v. Johnson, supra,* remain viable when determining whether a worker's occupational disability is partial or total. *See also, Ira A. Watson Department Store v. Hamilton,* Ky., 34 S.W.3d 48 (2000), in which we reached the same conclusion.

■ An analysis of the factors set forth in KRS 342.0011(11)(b), (11)(c), and (34) clearly requires an individualized determination of what the worker is and is not able to do after recovering from the work injury. Consistent with *Osborne v. Johnson, supra,* it necessarily includes a consideration of factors such as the worker's post-injury physical, emotional, intellectual, and vocational status and how those factors interact. It also includes a consideration of the likelihood that the particular worker would be able to find work consistently under normal employment conditions. A worker's ability to do so is affected by factors such as whether the individual will be dependable and whether his physiological restrictions prohibit him from using the skills which are within his individual vocational capabilities. The definition of "work" clearly contemplates that a worker is not required to be homebound in order to be found to be totally occupationally disabled. *See, Osborne v. Johnson, supra,* at 803.

■ Although the Act underwent extensive revision in 1996, the ALJ remains in the role of the fact-finder. KRS 342.285(1). It is among the functions of the ALJ to translate the lay and medical evidence into a finding of occupational disability. Although the ALJ must necessarily consider the worker's medical condition when determining the extent of his occupational disability at a particular point in time, the ALJ is not required to rely upon the vocational opinions of either the medical experts or the vocational experts. *See, Eaton Axle Corp. v. Nally,* Ky., 688 S.W.2d 334 (1985); *Seventh Street Road Tobacco Warehouse v. Stillwell,* Ky., 550 S.W.2d 469 (1976). A worker's testimony is competent evidence of his physical condition and of his ability to perform various activities both before and after being injured. *Hush v. Abrams,* Ky., 584 S.W.2d 48 (1979).

■ KRS 342.285(2) provides that when reviewing the decision of an ALJ, the Board shall not reweigh the evidence and substitute its judgment for that of the ALJ with regard to a question of fact. The standard of review with regard to a judicial appeal of an administrative decision is limited to determining whether the decision was erroneous as a matter of law. *See American Beauty Homes v. Louisville & Jefferson County Planning & Zoning Commission,* Ky., 379 S.W.2d 450, 457 (1964). Where the ALJ determines that a worker has satisfied his burden of proof with regard to a question of fact, the issue on appeal is whether substantial evidence supported the determination. *Special Fund v. Francis,* Ky., 708 S.W.2d 641, 643 (1986). Substantial evidence has been defined as some evidence of substance and relevant consequence, having the fitness to induce conviction in the minds of reasonable people. *Smyzer v. B.F. Goodrich Chemical Co.,* Ky., 474 S.W.2d 367 (1971). Although a party may note evidence which would have supported a different conclusion than that which the ALJ reached, such evidence is not an adequate basis for reversal on appeal. *McCloud v. Beth–Elkhorn Corp.,* Ky., 514 S.W.2d 46 (1974). The crux of the inquiry on appeal is whether the finding which was made is so unreasonable under the evidence that it must be viewed as erroneous as a matter of law. *Special Fund v. Francis, supra,* at 643.

Here, the ALJ determined from the evidence that the claimant could not return to any gainful employment at the time of the award but referred the claimant for vocational rehabilitation with the hope that he could be retrained for sedentary employment. The ALJ's finding was affirmed by the Board and the Court of Appeals based upon an interpretation of KRS 342.0011(11) and (34) with which we agree. Having reviewed the evidence and the arguments of the parties, we conclude that the employer has failed to demonstrate that the finding of permanent, total disability was so unreasonable that it must be viewed as erroneous as a matter of law. In the event that the claimant undergoes successful vocational rehabilitation and is able to return to work, the employer remains free to move to reopen the award.

The decision of the Court of Appeals is affirmed.

All concur.